# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

————————

m 01-41298

————————

ANTHONY D. VIAZIS, ET AL.,

Plaintiffs,

ANTHONY D. VIAZIS,

Plaintiff-Appellant,

VERSUS

AMERICAN ASSOCIATION OF ORTHODONTISTS, ET AL.,

Defendants,

AMERICAN ASSOCIATION OF ORTHODONTISTS,
SOUTHWESTERN SOCIETY OF ORTHODONTISTS, GAC INTERNATIONAL, INC.,
AND LEO A. DOHN,

Defendants-Appellees.

————————————

Appeal from the United States District Court
for the Eastern District of Texas

————————————

December 11, 2002

Before KING, Chief Judge, and SMITH and EMILIO M. GARZA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Anthony Viazis appeals a judgment as a matter of law ("j.m.l.") in favor of the American Association of Orthodontists ("AAO"), the Southwestern Society of Orthodontists ("SWSO"), GAC International, Inc. ("GAC"), and Leo A. Dohn. Finding no reversible error, we affirm.

I.

Viazis, an orthodontist practicing in the Dallas area, designed and patented a triangular orthodontic bracket in 1991.[1] He contends that his bracket is more effective than other designs in that it decreases the amount of time braces must be worn. In 1992, Viazis entered into a contract with GAC, a manufacturer of orthodontic devices, to market and distribute his bracket.

In April 1996, Viazis sent an advertising mailer to the parents of school age children in the Plano, Texas, area near Dallas, claiming that braces made using the Viazis bracket were faster, less expensive, and potentially safer than other products. In May of that year, Viazis held a seminar promoting his brackets directly to these parents. A member of the Greater Dallas Association of Orthodontists ("GDAO") and the AAO forwarded a complaint regarding Viazis's advertisements to the AAO, indicating that Viazis's conduct might violate provisions of that organization's Code of Professional Responsibility.

Viazis alleged that the resulting controversy surrounding his advertisements resulted in the termination of the marketing aspect of his agreement with GAC. There was an adverse impact on the relationship between Viazis and GAC, and their arrangement was restructured in mid-1997. GAC continued to manufacture the Viazis bracket but ceased all marketing activities.

In December 1997, the AAO advised Viazis that he could be subject to disciplinary action as a result of the claims of faster, safer, and more effective treatment made in his advertisements. In December 1999, after a hearing and appeal, the AAO suspended Viazis's membership in the organization.

Meanwhile, in August 1998, Viazis filed this action against the AAO, the SWSO, the GDAO, and various individuals who are no longer defendants. Viazis subsequently added Dohn and GAC as defendants. By the time of trial, Viazis's only remaining claim was that the AAO, SWSO, GAC, and Dohn had conspired to exclude his brackets from the market for orthodontic devices in violation of § 1 of the Sherman Act. At the conclusion of Viazis's case-in-chief at trial, the court granted defendants' motion for j.m.l.

II.

We review a j.m.l. *de novo*. *Casarez v. Burlington N./Santa Fe Co.*, 193 F.3d 334, 336 (5th Cir. 1999). To defeat a motion for j.m.l., the nonmovant must present "substantial evidence opposed to the motion[]."[2] In other words, the nonmovant must present evidence

---

[1] Brackets are components of braces that are fixed onto the teeth with an adhesive. Wires are then passed through the brackets, and forces are applied to straighten the teeth.

[2] *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), *overruled in part on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc).

that is "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id*.

Section 1 of the Sherman Act does not proscribe independent conduct. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). So, to establish a § 1 violation, a plaintiff must demonstrate concerted action. *Id*. Further, although in ruling on a motion for j.m.l. the court must consider all the evidence offered by either party "in the light and with all reasonable inferences in favor of" the party opposed to the motion, *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 481 (5th Cir. 2001) (internal quotation marks omitted), in this case the range of permissible inferences is limited by particular principles of antitrust law, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Accordingly, evidence of conduct that is "as consistent with permissible competition as with illegal conspiracy" cannot support an inference of conspiracy. *Id*. In essence, an antitrust plaintiff who is unable to present direct evidence of a conspiracy must introduce circumstantial evidence that "tends to exclude the possibility of independent action." *Monsanto*, 465 U.S. at 768.

Viazis contends that he introduced sufficient evidence of concerted action to avoid j.m.l. He alleges that GAC terminated the marketing agreement in response to threats made by AAO and its regional affiliates. He also contends that the decision of an AAO disciplinary committee to suspend him for one year was the result of unlawful concerted action. Viazis failed to introduce sufficient evidence to prove either allegation.

A.

Direct evidence of a conspiracy is that which "explicitly refer[s] to an understanding" between the alleged conspirators. *See Southway Theatres, Inc. v. Ga. Theatre Co.*, 672 F.2d 485, 493 n.8 (5th Cir. 1982). The letter written by Leo Dohn, then-CEO of GAC, which constitutes Viazis's primary evidence bearing on the existence of a conspiracy between the AAO and GAC, contains no explicit reference to an agreement between GAC and any party. Each of the statements from the letter offered by Viazis as evidence of a conspiracy depends on additional inferences.[3] Therefore, the letter is, at most, circumstantial evidence of a conspiracy.[4]

---

[3] Viazis asserts that Dohn's statements to the effect that GAC might experience national repercussions are "inconsistent with localized complaints," and he claims that Dohn's prediction that Viazis would suffer adverse professional consequences as a result of his seminar are "consistent with ongoing communications." Neither these statements nor any other of the passages cited by Viazis contain explicit reference to an agreement between GAC and any other party.

[4] Viazis contends that he introduced evidence of a conspiracy through testimony that the district court improperly disregarded. The testimony at issue related to whether GAC had a policy against advertising directly to consumers before the events at issue. Dohn testified that GAC had a policy against advertising directly to the public, although Barry Mervine, GAC's representative in Dallas, testified that he was unaware of any such policy. In addition, Viazis testified that GAC had foreknowledge of, and input into, a mailer through which he advertised to the public but failed to object to its contents.

Although, in ruling on a motion for j.m.l., a district court should refrain from making credibility determinations, *see Conkling v. Turner*, 18 F.3d (continued...)

As discussed above, in the absence of direct evidence of a conspiracy, an antitrust plaintiff must present evidence tending to exclude the possibility of independent conduct. *Monsanto*, 465 U.S. at 768. To do so, Viazis was required to demonstrate that GAC and AAO "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id*. Although the Dohn letter contains evidence of complaints received by GAC from accounts in the Dallas area, such complaints are insufficient evidence of concerted action, because "[d]ealer-initiated contact fails to establish that a manufacturer

---

[4](...continued)
1285, 1300 (5th Cir. 1994), the court did not necessarily do so here. Mervine's testimony does not establish that GAC advertised directly to consumers, nor even that GAC lacked a policy prohibiting such advertising. All Mervine's testimony establishes is that if such a policy existed or such advertisement took place, he was unaware of it. His testimony, therefore, does not directly contradict Dohn's. Viazis's testimony has a greater tendency to undercut the existence of a longstanding policy against direct advertisement but does not contradict GAC's contention that it had not engaged in direct advertisement in the preceding decade.

In any event, even if the court improperly evaluated the credibility of these two witnesses in arriving at its conclusions, the legal result would be the same. Although proof of a preexisting policy tends to support an inference of independent conduct, *see Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 594 (5th Cir. 1993); *Culberson, Inc. v. Interstate Elec. Co.*, 821 F.2d 1092, 1094 (5th Cir. 1987), the absence of such a policy does not necessarily support an inference of conspiracy. As discussed in part I.B.2 *infra*, GAC was entitled to act in response to customer complaints irrespective of whether it had a preexisting policy.

has imposed restrictions collusively, not based on its independent business judgment."[5] In *Culberson*, this court specifically held that a manufacturer's action in the face of customer complaints is not a sufficient basis for a finding of conspiracy.[6]

---

[5] *Culberson*, 821 F.2d at 1094; *see also Matrix Essentials*, 988 F.2d 587.

[6] *See Culberson*, 821 F.2d at 1093. Viazis's attempts to distinguish the *Monsanto* line of cases are unpersuasive. He accurately notes that the reasoning in *Monsanto* and its progeny reflects some concern that allowing dealer complaints to serve as evidence of conspiracy would deter legitimate business strategies, such as the adoption of marketing strategies using nonprice restrictions. Viazis contends that such concerns are not implicated here, because "conspiracies aimed at stamping out promising new technology should not be made unduly difficult to prove."

Even if manufacturers' ability to impose legitimate nonprice restrictions were the principal focus of *Monsanto*, this conclusional statement fails to offer any ground for distinguishing the present case. This case implicates GAC's ability to enforce its particular marketing strategy, namely, that of marketing to health professionals rather than the public, and therefore is not distinguishable from *Monsanto* on the ground argued by Viazis.

Further, Viazis ignores the fact that the *Monsanto* Court dealt with the "*two* important distinctions that are at the center of [any] distributor-termination case." *Monsanto*, 465 U.S. at 761 (emphasis added). The distinction between price and nonprice restrictions was the second of these; the first was "the basic distinction between concerted and independent action." *Id*. The Court dealt with this distinction by reaffirming the principle that "[a] manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Id*. (continued...)

4

Viazis argues, however, that GAC was faced with more than mere dealer complaints. Instead, he maintains, the AAO itself threatened a nationwide boycott to coerce GAC to end its marketing efforts on behalf of Viazis, and GAC acceded to AAO's demands. Such an inference of conspiracy is appropriate only if Viazis presented evidence tending to exclude the possibility of independent conduct on the part of AAO and GAC. To meet this standard, Viazis needed to show both that the AAO threatened a boycott and that GAC's decision to cease marketing the Viazis bracket was inconsistent with its independent self-interest. He failed to do so.

A corporate entity such as the AAO can act only through its agents. Consequently, in the absence of evidence of formal decisionmaking, an antitrust plaintiff must prove an association's conduct by demonstrating that the action was taken by individuals having apparent authority to act for the association. *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 556-67 (1982).

The Dohn letter contains no indication that any of the referenced complaints was initiated by individuals having either actual or apparent authority to speak for the AAO. Viazis introduced no evidence of a membership vote or other formal decisionmaking process through which the AAO acted to threaten GAC or authorized its agents to do so. Nor did he produce evidence that the unnamed Dallas accounts referred to in the Dohn letter had apparent authority to speak for the AAO on such

a matter. Viazis has introduced no evidence that the AAO itself, as opposed to some of its individual members, took action with respect to GAC.

Moreover, evidence that a manufacturer took certain actions does not tend to exclude the possibility of independent conduct if the actions were in the manufacturer's independent self-interest.[7] In other words, even if Viazis proved that the AAO or its regional affiliates threatened GAC, he must also show that GAC decided to end its relationship in response to those threats. If GAC ignored the threats but ended the relationship with Viazis based on an independent evaluation of its best interests, GAC acted independently, and there was no conspiracy. *See Matrix Essentials*, 988 F.2d at 594; *Lovett*, 998 F.2d at 579-81. Viazis failed to demonstrate that GAC's decision to alter its relationship with Viazis was contrary to its own interests.

Viazis introduced statements made by GAC regarding the enormous potential market for his bracket and argued that GAC could not have been acting in its own interests when it abandoned its marketing rights. This argument fails, because GAC could have determined that the potential benefits from its marketing agreement with Viazis would be outweighed by the loss of business that would result from its continued association with him.[8] Therefore,

---

[6](...continued)
(citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). GAC's ability to deal or refuse to deal with Viazis is implicated by these proceedings.

[7] *See Matrix Essentials*, 988 F.2d at 594; *Lovett v. Gen. Motors Corp.*, 998 F.2d 575, 579-81 (8th Cir. 1993).

[8] *See Bailey's, Inc. v. Windsor Am., Inc.*, 948 F.2d 1018, 1030 (6th Cir. 1991); *see also Garment Dist., Inc. v. Belk Stores Servs., Inc.*, 799 F.2d 905, 909 (4th Cir. 1986) ("One [legitimate
(continued...)

GAC's decision to alter its relationship with Viazis is not evidence tending to exclude the possibility of independent behavior.

B.

Although there is no evidence that any authorized agent of the AAO threatened GAC, Viazis does point to one instance of official conduct by the AAO, namely, his suspension pursuant to the finding of an AAO ethics committee that he had violated the organization's prohibition of false and misleading advertising. Because there is no connection between this proceeding and GAC, it can constitute action pursuant to a conspiracy only if the members of AAO were conspiring among themselves. Viazis failed to present sufficient evidence of such a conspiracy.

Despite the fact that "[a] trade association by its nature involves collective action by competitors[,] . . . [it] is not by its nature a 'walking conspiracy', its every denial of some benefit amounting to an unreasonable restraint of trade." *Consolidated Metal Products, Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293-94 (5th Cir. 1988). In *Consolidated Metal Products*, we rejected a claim of conspiracy based on a trade association's delay in licensing the plaintiff's product, noting that the plaintiff had failed to offer evidence that the proceedings were "merely a ploy to obscure a conspiracy against competing producers." *Id.* at 294. Viazis similarly was unable to demonstrate that the ethics proceedings against him were a sham or that the standards applied were pre-

—————————

[8](...continued)
reason for terminating a relationship with a dealer] is to avoid losing the business of disgruntled dealers.").

textual,[9] so he failed to establish the existence of an unlawful conspiracy. *See id.* To the extent that he challenges the promulgation of the advertising restrictions by the AAO, as opposed to their enforcement, his failure to demonstrate any competitive harm, as discussed below, is fatal to that claim.

III.

Even if Viazis had presented sufficient evidence of concerted action, § 1 of the Sherman Act prohibits only those agreements that constitute unreasonable restraints of trade. *Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985) (citation omitted). The question whether a particular restraint is unreasonable frequently turns on whether it is examined under the rule of reason or falls within the category of practices that are judged to be unreasonable *per se*. If application of the *per se* rule is appropriate, competitive harm is presumed, and further analysis is unnecessary. If, by contrast, the restraint should be judged according to the rule of reason, its net potential for competitive harm must be evaluated by weighing its probable anticompetitive effects

—————————

[9] During the appeal of Viazis's suspension, Dr. Hershey, one of the panelists, told Viazis: "It's not your work Tony. Next time, play by the rules." This comment is certainly suspicious, but it is not direct evidence of conspiracy, because it does not explicitly reference any agreement. In addition, Hershey's statement is not inconsistent with the committee's finding that Viazis violated the AAO's prohibition of deceptive advertising. The committee could have found Viazis's bracket to be a good product, while still concluding that Viazis had used inappropriate methods to promote it. In any event, in light of the fact that GAC ended its marketing arrangement with Viazis over a year before his suspension, the exclusion of which Viazis complains had long since occurred.

6

against any procompetitive benefits.

A.

Viazis contends that the advertising restrictions in question should be reviewed according to the *per se* rule. Typically, it is the type of restraints that are "always or almost always" anticompetitive that are deemed to be unreasonable *per se*. *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 19-20 (1979). The Supreme Court has been reluctant to apply the *per se* rule to standards promulgated by professional organizations, such as the advertising restriction at issue here.[10]

In fact, the Court recently concluded that advertising restrictions imposed by a professional association are not subject to a *per se* analysis. In *Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999), a case dealing with the legality of advertising restrictions that are remarkably similar to those at issue here, the Court necessarily rejected the application of the *per se* rule by holding that even the truncated rule of reason, or "quick look," treatment applied by the Ninth Circuit was insufficient given the potential procompetitive effects of such restrictions in a market for professional services. *Id.* at 763-81. The *per se* rule likewise is inapplicable to the restrictions at issue in this case.

B.

Although *California Dental* rejected the application of *per se* or even quick-look analysis to advertising restrictions implemented by a professional association, it did not hold that

a full market analysis is required in such cases. *Id.* at 779. Instead, the Court held that "[w]hat is required is an enquiry meet for the case." *Id*. at 780. Under this approach, an analysis is sufficient if it openly addresses the "circumstances, details, and logic of a restraint" in reaching its conclusion. *Id*. at 781.

In *California Dental*, the Court recognized that a restriction on advertising related to quality has several potential procompetitive justifications.[11] On remand, the Ninth Circuit determined that the FTC had failed to prove that the advertising restrictions at issue were a net harm to competition. *Cal. Dental Ass'n v. FTC*, 224 F.3d 942, 957 (9th Cir. 2000). The court noted that the Federal Trade Commission had failed to prove actual harm by presenting relevant data from the precise market at issue. *Id*.

Viazis similarly has failed to present data demonstrating the anticompetitive effects of the advertising restrictions of which he complains. In the absence of such data, he has not carried his burden to demonstrate that the restrictions have a net anticompetitive effect. *See id*.

Viazis claims that competitive harm is demonstrated by the steep decline in sales of his brackets to orthodontists. There is no evidence, however, that the AAO has influence over its members' purchasing decisions or that it coerced them into rejecting Viazis's brack-

---

[10] *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986) ("[W]e have been slow to condemn rules adopted by professional associations as unreasonable *per se*.").

[11] *Cal. Dental*, 526 U.S. at 778 (noting that a restriction on quality- related advertisement for professional services may be justified by the possibility "that restricting difficult-to-verify claims about quality or patient comfort would have a procompetitive effect by preventing misleading or false claims that distort the market").

ets. In *Consolidated Metal Products*, 846 F.2d at 296, we held that where an association's product recommendations were non-binding and the association did not coerce its members to abide by its recommendations, its refusal to sanction plaintiff's product did not show that plaintiff was excluded from the market. Nor can a plaintiff show competitive harm merely by demonstrating that the defendant "refused without justification to promote, approve, or buy the plaintiff's product." *Id*. at 297.

Though there is evidence demonstrating a drastic reduction in the number of orthodontists purchasing Viazis's brackets, there is none connecting that decrease to anything other than the voluntary decisions of independent orthodontists. Moreover, GAC has, at most, a 20% market share in orthodontic brackets. Therefore, GAC's refusal to market on behalf of Viazis could not significantly impede his ability to market the brackets, either independently or through GAC's competitors.

Indeed, Viazis has been successful in marketing his brackets to dentists and remains free to sell them to any orthodontist willing to purchase them. In the absence of proof that the AAO and its member orthodontists are engaging in a conspiracy, Viazis cannot prove harm to competition, because he can demonstrate nothing more than that his product is no longer selling well, at least not to orthodontists.

IV.

Viazis challenges two evidentiary rulings. First, he contends that the court erred in refusing to admit expert testimony to the effect that "consumers would have been harmed by the suppression" of the brackets. The testimony was excluded based on the determination that the testimony was not contained in the expert's report, as required by Local Rule 26(d)(1). In challenging this ruling, Viazis cites a passage in the expert's report that contains the excluded testimony almost *verbatim*. It therefore appears that the district court may have erred in determining that the testimony should be excluded under the local rule.

Nonetheless, we "may not disturb the district court's exclusion of the evidence . . . if that ruling can be upheld on other grounds, regardless of whether the court relied on those grounds." *Metallurgical Indus., Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1207 (5th Cir. 1986). The excluded testimony concerned alleged harm to the orthodontic services market, rather than the relevant market for purposes of Viazis's claim, which is the market for orthodontic braces. The testimony therefore was arguably irrelevant, as noted by the district court, and could have been excluded on that ground as well. *See* FED. R. EVID. 401.

Viazis also asserts that the district court erred in refusing to allow cross-examination concerning portions of a note written by Dohn that recognized the possibility that Viazis could file a § 1 claim against GAC. The excluded portion was hearsay, but Viazis argues that it should have been admitted under the exception for statements made by coconspirators.

Under the coconspirator exception, hearsay evidence is admissible only if the proponent proves by a preponderance of the evidence that (1) a conspiracy existed; (2) the statement was made in furtherance of that conspiracy; and (3) the coconspirator and the party opposing admission were members of the conspiracy. *Burton v. United States*, 237 F.3d 490, 503 (5th Cir. 2000). Because no con-

spiracy was established here, the coconspirator exception cannot apply, and the evidence was not admissible against AAO and the other association defendants.

Additionally, GAC contends that the passage in question was based on communications between Dohn and his attorney, and that it is therefore privileged attorney-client material and inadmissible. The district court did not abuse its discretion in excluding testimony regarding the note on either of these grounds.

In any event, we will not reverse erroneous evidentiary rulings unless the aggrieved party can demonstrate "substantial prejudice." *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 602 (5th Cir. 2000). Viazis failed to demonstrate that the exclusion of either of these pieces of evidence resulted in substantial prejudice.

AFFIRMED.