United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 25, 2003**

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

―――――――――

ɱ 02-50811

―――――――――

RONALD CLEVELAND,
DOING BUSINESS AS LONE STAR VIDEOTRONICS;
PHOENIX-MERCHANT INVESTMENTS INC.,
DOING BUSINESS AS 49ER VIDEO;
THE BIG PICTURE VIDEO INC.,
ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

Plaintiffs-Appellants,

VERSUS

VIACOM INC., ET AL.,

Defendants,

VIACOM INC.;
PARAMOUNT HOME VIDEO, INC.; BUENA VISTA HOME ENTERTAINMENT, INC.;
COLUMBIA TRI-STAR HOME VIDEO, INC.; UNIVERSAL STUDIOS HOME VIDEO, INC.;
TWENTIETH CENTURY FOX HOME ENTERTAINMENT, INC.; BLOCKBUSTER INC.,

Defendants-Appellees.

―――――――――――

Appeal from the United States District Court
for the Western District of Texas
ɱ SA-99-CA-783-EP

―――――――――――

Before DAVIS, SMITH, and DUHÉ,
    Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Plaintiffs, independent video retailers, sued Blockbuster Inc. ("Blockbuster"), its parent company Viacom Inc. ("Viacom"), and the home-video affiliates of the seven major Hollywood movie studios,[2] alleging price discrimination and antitrust violations. The claims turn largely on the studios' output revenue-sharing agreements with Blockbuster, whereby rental tapes are made available to Blockbuster for a low initial price in exchange for a portion of rental revenues and a long-term commitment to purchase all the movies released by each studio. At the close of the plaintiffs' case-in-chief, the defendants moved for judgment as a matter of law ("j.m.l."), which the district court granted. We affirm.

## I.

Plaintiffs Ronald Cleveland, d/b/a Lone Star Videotronics, Phoenix-Merchant Investments Inc., d/b/a 49er Video, and The Big Picture Video Inc., are independent video retailers in competition with Blockbuster, a large national chain. The parties agree that by 1997, the home-video rental market was struggling. Under the pricing models prevalent at that time, neither independent retailers, such as plaintiffs, nor large chains, such as Blockbuster, had sufficient copies of "new release" titles available ("copy depth") at the time customer demand was highest. The result was customers frustrated by their inability to rent the movies they most desired to see.

Until 1997, distributors serving independent retailers and large chains such as Blockbuster typically purchased tapes from the studios through traditional purchases for a set price or through "cherry pick" revenue sharing, neither of which options provided adequate copy depth. Beginning in late 1997, however, Blockbuster entered into long-term output revenue sharing contracts with the studios,[3] enabling Blockbuster significantly to increase its new release copy depth, improving its ability to provide customers with desired titles.

Plaintiffs sued Blockbuster, Viacom, and the studio defendants, alleging that Blockbuster conspired with the studios to deny independent retailers long-term output revenue-sharing agreements functionally equivalent to its own. On the basis of these allegations, plaintiffs asserted claims under § 1 of the Sherman Act, 15 U.S.C. § 1; the Robinson-Patman Act, 15. U.S.C. § 13; and parallel California statutes.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[2] Defendants Paramount Home Video, Inc.; Buena Vista Home Entertainment, Inc.; Time Warner Entertainment Company, L.P.; Columbia Tri-Star Home Video, Inc., Twentieth Century Fox Home Entertainment, Inc.; and Metro-Goldwyn-Mayer Home Entertainment, Inc. (collectively "studios" or "studio defendants").

[3] Under revenue sharing agreements, studios lease tapes to retailers for lower up-front payments in return for a percentage of their revenues. Under "cherry pick" revenue sharing agreements, retailers are permitted to choose the specific tapes it wanted to purchase on a title by title basis. "Output" revenue sharing agreements, by contrast, require the retailer to acquire all titles a studio releases, regardless of box office performance and local market considerations.

2

## II.

We review a j.m.l. *de novo*. *Arguello v. Conoco, Inc.*, 330 F.3d 355, 357 (5th Cir. 2003). "A j.m.l. is appropriate only where 'there is no legally sufficient basis for a reasonable jury to find for [a] party.'"[4] To defeat a motion for j.m.l., the nonmovant must point to a conflict in substantial evidence. *Casarez v. Burlington N./Santa Fe Co.*, 193 F.3d 334, 336 (5th Cir. 1999). Substantial evidence is evidence "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id*.

## A.

Plaintiffs advance two theories of concerted action in violation of § 1. First, they allege a horizontal conspiracy among the studios that was orchestrated by Blockbuster. Specifically, they contend that, at Blockbuster's instigation, the studio defendants conspired with each other to exclude independents from enjoying pricing terms similar to those provided to Blockbuster. Second, plaintiffs argue that Blockbuster's separate agreements with the individual studio defendants constitute a series of vertical conspiracies to exclude independents from enjoying favored pricing arrangements.

Plaintiffs rely entirely on circumstantial evidence in support of their claims. In reviewing a j.m.l., we consider all evidence in the light most favorable to the nonmovant, *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 481 (5th Cir. 2001), and draw all inferences from the evidence in favor of the party opposed to the motion, *id*. In antitrust cases, however, "the range of permissible inferences is limited by particular principles of antitrust law." *Viazis*

*v. Amer. Ass'n of Orthodontists*, 314 F.3d 758, 762 (5th Cir. 2002) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)), *cert. denied*, 123 S. Ct. 2078 (2003). "Accordingly, evidence of conduct that is 'as consistent with permissible competition as with illegal conspiracy' cannot support an inference of conspiracy." *Id*. (citing *Matsushita*, 475 U.S. at 588).

Therefore, in the absence of direct evidence of conspiracy, a plaintiff must introduce circumstantial evidence that "tends to exclude the possibility of independent action." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 768 (1984); *Viazis*, 314 F.3d at 762. Attempting to satisfy this standard, plaintiffs introduced documentary evidence and testimony concerning defendants' parallel behavior. Neither, however, tended to exclude the possibility of independent conduct.

## 1.

First, plaintiffs rely on evidence demonstrating that Blockbuster planned to increase market share by "owning" the new release market. Plaintiffs also point to Blockbuster's 1998 Business Plan, which projected increasing its market share from 25% to 50%, a goal plaintiffs argue is unreasonable absent some sort of favorable pricing.

Whatever these items of evidence are intended to prove, they cannot support an inference of conspiracy. A company can set ambitious competitive goals for itself, such as "owning" a portion of the market or significantly increasing its market share, without giving rise to a presumption that it intends to use illegal means to achieve those goals.

Plaintiffs also rely on the statement of a Fox vice-president that Blockbuster had requested

---

[4] *Id*. (citing FED. R. CIV. P. 50(a)(1)).

3

a "special deal" and "did not want [that deal] to be given to independents." The Fox officer also stated, however, that during the meeting at which that statement was made, Fox had refused to enter into any exclusive deal with Blockbuster.[5]

It is on the basis of this circumstantial evidence that plaintiffs attempt to establish concerted action. There is almost no evidence whatsoever, circumstantial or otherwise, that the studios engaged in any direct communication during their respective negotiations with Blockbuster or that any studio agreed, at Blockbuster's request, not to make output revenue-sharing terms available to independents.

---

[5] Plaintiffs also reference various internal memoranda making somewhat similar points. A 1997 Fox memorandum described the Blockbuster proposal as creating a favored revenue share relationship. The mere use of the word "favored" to describe a proposed business relationship, however, does not strongly support an inference of conspiracy, especially where, as plaintiffs concede, other large chain retailers eventually arranged similar deals.

Plaintiffs also point to two Warner memos that evidenced concern over industry backlash to the Blockbuster proposal and the possibility that its terms "[c]ould spur government inquiry into video pricing practices." Fear of the possible implications of the deal do not support an inference of conspiracy to exclude the independents.

Finally, a Disney memo stated that the company hoped to extend the Blockbuster terms to other key retailers, but apparently not to independent retailers. That memo does not imply that the decision not to extend the terms to independents was influenced by Blockbuster or another studio. In fact, none of these memos even indirectly refers to an agreement between the studios or to an unlawful request by Blockbuster to exclude independents.

2.

Plaintiffs argue that in addition to the previously discussed circumstantial evidence, the studios' parallel conduct gives rise to an inference of conspiracy. The mere fact that defendants followed similar courses of action, however, does not support such an inference.

The complained-of conduct is not the studios' agreements with Blockbuster *per se*, but rather the alleged refusal of any of the studio defendants to deal with the independents on similar terms. That conduct constitutes an antitrust violation only if it is the result of an agreement[6] rather than of each studio's independent business judgment. Consequently, plaintiffs must present "significant probative evidence" that the studios' parallel conduct "was contrary to their economic self-interest so as not to amount to a good-faith business judgment." *Royal Drug Co. v. Group Life & Health Ins. Co.*, 737 F.2d 1433, 1437 (5th Cir. 1984).[7]

Plaintiffs support their contention that defendants' conduct was contrary to their economic self-interest with conclusional testimony from their expert witness. That testimony is based in part on the simplistic assumption that

---

[6] Because plaintiffs allege horizontal and vertical theories of conspiracy, the unlawful agreement could be either among the studios generally or between each individual studio and Blockbuster.

[7] This is true regardless of whether Blockbuster wrongfully requested preferential treatment because, even in the face of such requests, a company's decision to take actions that are in its own interest cannot support an inference of conspiracy. *See Viazis*, 314 F.3d at 764; *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 594 (5th Cir. 1993); *Lovett v. Gen. Motors Corp.*, 998 F.2d 575, 579-81 (8th Cir. 1993).

because the studio's received greater revenues under the terms of their deals with Blockbuster, they likewise would have received greater revenues under similar deals with distributors serving independents. This approach ignores significant differences between independent retailers and large chains such as Blockbuster. Such speculative and self-serving expert testimony is an insufficient basis for plaintiffs' claims of concerted action.[8]

B.

To establish price discrimination, plaintiffs rely on the disparity between the prices plaintiffs' distributors paid for tapes and the amounts paid by Blockbuster. The Robinson-Patman Act and the California Unfair Trade Practices Act, however, prohibit price discrimination only where customers are otherwise purchasing on like terms and conditions.[9]

As defendants point out, the transactions at issue here are not reasonably comparable. Most significantly, distributors servicing independents such as plaintiffs could select tapes title-by-title after box office results were known, while Blockbuster was committed to purchasing a studio's entire output. Moreover, Blockbuster, unlike the distributors, undertook long-term obligations under its agreement with the studios. As a result of the significant differences among between the terms of the agreements, any disparities in amounts paid cannot support a claim for price discrimination.[10]

III.

Plaintiffs appeal the denial of their request for injunctive relief under 15 U.S.C. § 26, which authorizes district courts to provide relief "against threatened loss or damage by a violation of the antitrust laws." We review a denial of injunctive relief for abuse of discretion. *Peaches Entm't Corp. v. Entm't Repertoire Assocs., Inc.*, 62 F.3d 690, 693 (5th Cir. 1995). Consequently, we uphold a denial of injunctive relief unless the district court has relied on clearly erroneous factual findings or erroneous conclusions of law. *N. Alamo Water Supply Corp. v. City of San Juan*, 90 F.3d 910, 916-17 (5th Cir. 1996).

Plaintiffs argue that they are entitled to such relief even if their substantive claims are rejected, because the relevant statutes do not require actual injury, but merely threatened harm. The threatened harm, though, must be a result of "a *violation* of the antitrust laws." 15 U.S.C. § 26.[11] Because plaintiffs have lost on the is-

---

[8] *See 7-Up Bottling Co. v. Archer Daniels Midland Co. (In re Citric Acid Litig.)*, 191 F.3d 1090, 1106 n.9 (9th Cir. 1999); *Aviation Specialties, Inc. v. United Techs. Corp.*, 568 F.2d 1186, 1192 (5th Cir. 1978) (plaintiff's assertion that defendant's conduct was contrary to its economic interests held insufficient); *id*. at 1192 n.10 (profitable relationships with distributors insufficient to show that defendant acted against its interests in not adding plaintiff as distributor); *Cf. Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law . . . , it cannot support a jury's verdict.").

[9] *FTC v. Borden Co.*, 383 U.S. 637, 643 (1966).

[10] *Cf. Coastal Fuels, Inc. v. Caribbean*, 990 F.2d 25, 27 (1st Cir. 1993) ("[The Robinson-Patman Act does not] prohibit price differences between spot sales and long-term contract sales that reflect different market conditions.").

[11] Plaintiffs also requested injunctive relief un-
(continued...)

sue of whether a violation occurred, they are not entitled to injunctive relief.

AFFIRMED.

---

[11](...continued)
der parallel California statutes. *See* CAL. BUS. & PROF. CODE §§ 16750(a), 17078-80, 17203. Like their federal counterpart, these statutes authorize injunctive relief only against *violations* of the law.