**Floyd H. PLUECKHAHN,
Plaintiff-Appellant,**

**v.**

**FARMERS INSURANCE EXCHANGE,
et al., Defendants-Appellees.**

**No. 83–1787.**

United States Court of Appeals,
Fifth Circuit.

Jan. 2, 1985.

Rehearing Denied Jan. 30, 1985.

---

Samuel D. McDaniel, Austin, Tex., for plaintiff-appellant.

Carrington, Coleman, Sloman & Blumenthal, Dallas, Tex., Small, Craig & Werkenthin, Fred B. Werkenthin, Charles Herring, Jr., Austin, Tex., for defendants-appellees.

Before GARZA, REAVLEY, and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Plaintiff Floyd Plueckhahn contends that an employment policy of Farmers Group, Inc. prohibiting certain employees from working for Farmers Group, Inc. district managers violates § 1 of the Sherman Antitrust Act. The district court, after a

bench trial in which the parties submitted detailed Proposed Findings of Fact and Conclusions of Law, held for the defendants. This Court affirms the district court's decision.

## I. BACKGROUND

Defendants (Farmers Insurance Exchange, Farmers New World Life Insurance Co., Truck Insurance Exchange, Fire Insurance Exchange, Mid-Century Insurance Co., and Farmers Group, Inc.) are members of the Farmers Insurance Group. The "Farmers Insurance Group" is not itself a legal entity but instead is a name for the group of affiliated insurance companies (the defendants other than Farmers Group, Inc.) which are managed by Farmers Group, Inc. Defendants collectively refer to themselves as the Farmers Insurance Group, selling a variety of types of insurance coverage to the public.[1] Defendants, with the exception of the central management organization of Farmers Group, Inc., are insurance companies engaged in the business of selling insurance. The companies under the central management organization do not compete with one another; nor do they compete with Farmers Group, Inc., the central management organization. In the geographic areas in which they do business, each (with the exception of Farmers Group, Inc.) writes property, casualty, or life insurance which generally is not written by the other.[2] Defendant Farmers Group, Inc. is the management company

for the defendants and is an insurance holding company. Functioning as a management company, Farmers Group, Inc. is responsible for the development of an agency force and for the sale of insurance coverage within the other five affiliated defendant insurance companies. Farmers Group, Inc. fulfills these responsibilities by means of ten regional offices. Texas is one of those regions, and Austin is the regional office headquarters for Texas.

Plaintiff Floyd Plueckhahn was employed by the Texas regional office of Farmers Group, Inc. on June 12, 1962, and initially he worked on the claims staff of that office. In 1970, he became a Division Agency Manager for the Regional Sales Staff. The sales branch of the regional office is responsible for the marketing of the insurance products of its affiliated companies.[3] After Plueckhahn's promotion to one of the five Division Agency Manager positions, his duty was to supervise the District Managers. The District Managers work under an appointment contract. The District Managers consider themselves to be independent businessmen and may have other relationships with insurance companies outside the Farmers Insurance Group system. Although a District Manager does not sell policies himself, he is paid an override on each policy sold by agents under his supervision. The Divisional Agency Managers and Regional Agency Manager have extensive review duties over the District Managers.[4]

1. The group system of operation of Farmers Insurance Group is not uncommon in the insurance industry. Farmers Insurance Group and other groups, such as Allstate and State Farm, constitute a substantial portion of the American insurance industry.

2. Defendant Farmers Insurance Exchange writes auto insurance; defendant Mid-Century Insurance Co. writes preferred risk automobile insurance; defendant Fire Insurance Exchange insures residences against fire and loss; defendant Truck Insurance Exchange insures against certain commercial losses; and defendant Farmers New World Life Insurance Co. writes life insurance.

3. In supervising the marketing of these insurance products, Farmers Group, Inc.'s hierarchy includes a Regional Sales Manager, a Regional

Agency Manager, and five Division Agency Managers. The Regional Sales Manager heads the sales branch and reports to the Regional Manager. The Regional Agency Manager (who is below the Region Sales Manager) is in charge of Farmers Group, Inc.'s agents (who sell the policies of the affiliated companies to customers) and has overall responsibility for the recruitment and training of sales agents. Below the Regional Agency Managers are the five Division Agency Managers, who supervise the District Managers of the sales force.

4. The District Managers' specific responsibilities for Farmers Group, Inc. include locating persons interested in becoming insurance agents, assisting them to obtain approval from the Farmers Group, Inc. regional office, and (if the agents are approved) training, supervising, and

On January 1, 1978, Plueckhahn was promoted from Division Agency Manager to Regional Agency Manager for the sales staff in the Farmers Group, Inc. office in Austin. Approximately four months later, in April 1978, plaintiff Plueckhahn approached Mr. Oscar Pool, a District Manager of Farmers Group, Inc. in Dallas, Texas, and began negotiating with Mr. Pool to secure employment. Plueckhahn's decision to attempt to work for District Manager Oscar Pool conflicted with a longstanding policy of Farmers Group, Inc. regarding employment by Farmers' District Managers of certain Farmers Group, Inc. employees.[5] The policy's stated aim was to insure against favoritism by preventing employees in the supervisory regional office from going to work for persons they had previously supervised. Despite this conflict of interest provision, Plueckhahn signed an agreement with Pool on May 26, 1978. That agreement provided that Plueckhahn would begin working for Oscar Pool on July 15, 1978.

Plueckhahn continued to work for Farmers Group, Inc. without telling any of his superiors that he had signed an agreement with Pool. On June 15, 1978, Plueckhahn gave oral notice to Jack Lewis, his immediate supervisor and the Regional Sales Manager of Farmers Group, Inc., that he was resigning effective July 15, 1978, and was moving to Dallas to work for Pool. Based upon the Farmers Group, Inc. policy against transfers, its supervisors made a request to Pool on June 20, 1978, that Pool not hire Plueckhahn. Thereafter, on June 29, 1978, this request was withdrawn by those supervisors. Farmers Group, Inc. then gave permission for Plueckhahn to work for Pool. Between June 20 and June 29, 1978, Pool chose not to hire Plueckhahn and settled his employment contract with him.[6] Plueckhahn later settled with Pool

---

motivating them. The actual approval of the agents is a function of the regional sales staff. In addition, the Regional Agency Manager and a Division Agency Manager are responsible for establishing new agency districts, splitting and combining old districts, training District Managers, assisting them in their duties, and reviewing the results obtained by District Managers.

**5.** The pertinent portions of Farmers Group, Inc. policy provided as follows:

"D. *Transfer of Employees Between Departments or Offices*

b. *As Agent*—Salaried personnel may be considered for appointment as an Agent subject to approval of the Regional Manager or Functional Officer and the Vice President—Field Operations under the following conditions:

(1) Conditions set forth on page 13, Section II of the Personnel Policy and Procedure Manual must be met.

(2) Regional Staff members, members of the Regional Sales Manager's Staff, Division Agency Managers, Commercial and Life Sales Representatives, and Sales Trainees are not eligible for appointment as an Agent within their own Region or any other Region they have worked in during the past three years.

\*    \*    \*    \*    \*    \*

*Note:* These rules were established to avoid any possible implication of manipulation or favoritism. Rarely will an exception be made.

In such rare instances, the Regional Manager will submit a well-documented recommendation to the Vice President—Field Operations for final approval.

c. *In Any Other Employee or Non-Employee Capacity*

Our policy towards employees who leave us to become Office Managers, Training Specialists, etc., for District Managers parallels the guidelines set forth under appointment as an Agent.

In addition to the conditions under Agency appointment, employees seeking such positions should be advised that the Company does not consider these positions to be stepping stones to District Manager appointments. Our policy has generally been to appoint District Managers from amongst our more successful agents. Therefore, an employee must first become a successful agent before he will be considered for appointment to District Manager."

Thus, under this policy, Plueckhahn, as a member of the Regional Sales Manager's Staff, was not eligible to go to work for a District Manager in the Texas Region for three years.

**6.** The record is not entirely clear as to how much the withdrawn request influenced Pool in his decisionmaking. Some evidence in the record indicates that Pool's primary motivation was to maintain his good relations with the Farmers Insurance Group system and that he therefore acquiesced in the earlier request even though it had been formally withdrawn. Other evidence indicates that Plueckhahn's decision was based on information that he had received in the interim that Plueckhahn's family prob-

as to any claims he might have had under the employment contract. Less than a year later, Plueckhahn secured employment with another District Manager in the Farmers Group, Inc. system.

## II. RULE OF REASON ANALYSIS

Plueckhahn presented to the district court and argues here that the Farmers Group, Inc. policy violates section 1 of the Sherman Act. 15 U.S.C. § 1. He relies on two theories. The first argues that the defendant companies entered into an illegal combination or conspiracy for the purpose of restraining their employees from employment with District Managers and restraining District Managers from employing Farmers Group, Inc. employees. The second theory is that District Manager Pool and the defendant companies formed an illegal combination or conspiracy to enforce the illegal restraint. Plueckhahn characterizes the restraint to be a horizontal boycott and argues that this Court should imply both an anticompetitive purpose and effect through the per se standard.

■ This Court must reject Plueckhahn's contentions. The district court did not err in reviewing the alleged restraint under the "rule of reason" standard (rather than the per se standard) and in concluding that any restraint here was reasonable. Hence, even assuming that the defendant companies formed a combination or conspiracy under section 1 of the Sherman Act, the alleged restraint in issue evinces no violation of the antitrust laws.[7]

### A. Per se Illegality

■ Plueckhahn contends that the alleged restraint is per se illegal. Horizontal combinations requiring a per se analysis are those "agreements among *actual competitors* which restrain competition at the same level of distribution." *Transource International, Inc. v. Trinity Industries, Inc.*, 725 F.2d 274, 279 (5th Cir.1984) (emphasis added). In the instant case, the defendant companies competed neither in the selling of insurance nor in the purchasing of Plueckhahn's services. Thus, the district court did not err in applying a rule of reason analysis (rather than a per se standard) to Plueckhahn's first theory of a horizontal combination among the defendant companies.

■ Nor did the district court err in applying the rule of reason standard when Plueckhahn's second theory was considered. Under that theory, Plueckhahn argues that there was a horizontal combination or conspiracy to enforce the illegal restraint among the defendant companies and Pool. The defendant companies and Pool shared a unity of purpose that forecloses the actual competition necessary to command the per se analysis in this context. Both the defendant companies and Pool shared the legitimate purpose of marketing the products of the Farmers Insurance Group companies; the alleged restraint here served to eliminate conflicts of interest in pursuing that legitimate purpose. In this context, there can be no per se illegality absent horizontal competition. *See Blackburn v. Crum & Forster*, 611 F.2d 102, 104 (5th Cir.), *cert. denied*, 447 U.S. 906, 100 S.Ct. 2989, 64 L.Ed.2d 856

lems would unduly interfere with his job performance. The district court made no specific finding of fact on this issue, and, as we explain below, *see infra* at 245–247, the judgment of the district court must be affirmed, even assuming that Pool acquiesced to the Farmers Group, Inc. request and formed a conspiracy with the defendant companies.

**7.** Defendants argue vigorously that no section 1 violation could occur since the defendant companies constituted a common enterprise incapable of conspiring with itself. *See Copperweld Corp. v. Independence Tube Corp.*, — U.S. —, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). The

instant case presents a different question from *Copperweld* since the instant case does not involve a parent and its wholly-owned subsidiary. *See id.* at 2740. Nor does the instant case involve a situation of identity of ownership of the defendants as did a recent case by this Court, *Century Oil Tool, Inc. v. Production Specialties, Inc.*, 737 F.2d 1316 (5th Cir.1984). Thus *Copperweld* is not directly on point. However, as we note below, its analysis of unity of purpose is useful in determining whether the district court erred in applying a rule of reason analysis to the alleged restraint.

(1980);[8] *Copperweld,* —— U.S. at ——, 104 S.Ct. at 2742 (foreclosing section 1 liability entirely since parent and wholly-owned subsidiary, by necessity, have complete unity of interest); *Hood,* 739 F.2d at 1015 (same).

Moreover, applying the per se rule to the policy here would be destructive of the purpose of both the per se rule and the antitrust laws. This case does not present the classic case of a boycott in which a group of business competitors seeks to benefit economically by excluding other competitors from the market place. *See E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee,* 467 F.2d 178, 186–87 (5th Cir.1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973). In the instant case, the conflict of interest policy was found reasonable by the district court. It was enforced by an employer and one of its closely allied independent contractors. Enforcement of the policy has no apparent effect on the labor market for insurance employees outside the Farmers Insurance Group system. Given these circumstances, this case does not fit the classic boycott situation in which the Court may presume (through the per se analysis) that the conduct is a "naked restraint of trade with no purpose except stifling of competition" and in which this Court therefore would conclusively presume the restraint to be unreasonable. *See White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). *See generally* ABA Section of Antitrust Law, *Antitrust Law Developments (Second)* 40–49 (1984).

Consequently, the per se analysis does not apply. The rule of reason standard governs.

### B. Rule of Reason Analysis

Under the rule of reason standard, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). In determining whether a policy is reasonable, a court may examine such factors as whether the policy serves legitimate business purposes that strengthen competition, whether the policy is drawn narrowly to meet those purposes, and whether the alleged restraint has a substantial adverse effect in the relevant market. *See National Society of Professional Engineers v. United States,* 435 U.S. 679, 691–92 & n. 17, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978); *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243–44, 62 L.Ed. 683 (1918).

Farmers Group, Inc.'s policy promotes legitimate business concerns that have procompetitive effects. As the trial court found, the Farmers Group, Inc.'s policy does so by preventing both "the appearance of impropriety [and] ... actual impropriety." Amended Findings of Fact & Conclusions of Law No. 22. The reasoning behind this is to prevent conflicts of interest. Since employees in the regional office have extensive supervisory duties over District Managers in such areas as establishing and determining the boundaries of districts, approving agency applications for District Managers, determining quotas and targets for District Managers, and reviewing and evaluating District Managers, it is necessary that these decisions be made on sound business judgment rather than on an effort by a regional employee to "feather his own bed" by favoring a District Manager for whom he may wish to work.

Further, the policy in issue was drawn narrowly to meet this business interest. It applies to only 200 of the total 11,600 Farmers Group, Inc. employees. The policy allowed the affected employee to work for any District Manager outside of the Texas region. It also allowed the affected employee to work for a District Manager in Texas three years after his regional employment had terminated.

---

**8.** Plueckhahn's argument is also foreclosed by the holding in *Blackburn.* There, this Court held that the horizontal component was missing since the alleged target did not compete with the alleged conspirators. The situation here is identical; plaintiff Plueckhahn, the target of the alleged boycott, did not compete with the defendant companies or Pool.

Finally, Plueckhahn fails to demonstrate how the policy had a substantial adverse effect on the labor market for insurance company employees. Plueckhahn argues only that the policy interfered with interstate commerce and that the policy applies to more employees than himself. This is insufficient to show the substantial adverse market effect necessary under a rule of reason analysis. The defendant companies' share in purchasing employee services and the availability of other types of work for insurance employees is not demonstrated in the record. All in all, the procompetitive effects clearly outweigh the hypothetical anticompetitive effects.[9]

This Court finds that the district court did not err in holding that the conflict of interest provision here to be not unreasonable.

III. CONCLUSION

For the foregoing reasons the judgment of the district court is

AFFIRMED.

9. Plueckhahn attempts to beg the question of market definition and market share by stating that the relevant market "is the market for the labor services of those employed by the Farmers Group." Plaintiff-Appellant's Brief at 8. Plueckhahn offers no support for this market definition. Even taking a charitable view toward Plueckhahn's position, the narrowest market would be that for the labor services of insurance employees.