# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 13, 2007**

Charles R. Fulbruge III
Clerk

No. 06-60305

TUNICA WEB ADVERTISING, et al.

Plaintiffs-Appellants

v.

TUNICA CASINO OPERATORS ASSOCIATION, INC; et al.

Defendants

BARDEN MISSISSIPPI GAMING LLC; doing business as
Fitzgerald's Casino; BL DEVELOPMENT CORP, doing business
as Grand Casino Tunica; ROBINSON PROPERTY GROUP L P,
doing business as Horseshoe Casino & Hotel; TUNICA PARTNERS
II L P; BALLY'S OLYMPIA LIMITED PARTNERSHIP, doing
business as Bally's Saloon & Gambling Hall; HOLLYWOOD CASINO
CORPORATION; BOYD TUNICA INC, doing business as Sam's Town
Hotel & Gambling Hall; SHERATON TUNICA CORPORATION

Defendants-Appellees

Appeal from the United States District Court
for the Northern District of Mississippi

Before DAVIS, DENNIS, and PRADO, Circuit Judges.

DENNIS, Circuit Judge:

Appellants Cherry Graziosi and Tunica Web Advertising, Inc. ("TWA")
appeal the district court's December 19, 2005 decision granting summary
judgment in favor of appellees, a number of casinos located in Tunica County,

Mississippi,[1] on appellants' federal and state antitrust claims. Appellants claim generally that the casinos and others engaged in a concerted refusal to deal with TWA, and that their conduct is a per se violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. For the reasons stated below, we reverse and remand.

I.

In November 1999, Graziosi purchased the domain names "tunicamiss.com" and "tunicamississippi.com" for roughly $140 from the domain name registrar Network Solutions, Inc. Shortly thereafter, Graziosi leased those domain names to Circus Circus Mississippi, Inc., d/b/a Gold Strike Casino Resort ("Gold Strike")[2] for one year, at a rate of $2,000 per month. No website was established at either of the domain names; rather, a user who entered either of the domain names into his or her internet browser was, under the terms of the lease, automatically redirected to Gold Strike's website, goldstrikemississippi.com. When the lease expired, Gold Strike continued to lease the domain names from Graziosi on an exclusive, month-to-month basis for $5,000 per month.

In 2000, Graziosi formed appellant TWA. Graziosi is the CEO and sole shareholder of TWA. TWA acquired the domain name "tunica.com" from another company for approximately $20,000, and in November 2000, TWA leased "tunica.com" to Gold Strike for 90 days for $3,000 per month. Gold Strike continued to lease "tunica.com" from TWA through April 30, 2001.

---

[1] Appellees are Bally's Olympia Limited Partnership (d/b/a Bally's Saloon & Gambling Hall), Barden Mississippi Gaming, LLC (d/b/a Fitzgerald's Casino and Hotel), BL Development Corp. (d/b/a Grand Casino Tunica), Boyd Tunica, Inc. (d/b/a Sam's Town Hotel & Gambling Hall), HWCC-Tunica, Inc. (d/b/a Hollywood Casino Tunica), Robinson Property Group, Ltd Partnership (d/b/a Horseshoe Casino & Hotel), Sheraton Tunica Corporation (d/b/a Sheraton Casino & Hotel), and Tunica Partners II LP (d/b/a Harrah's Tunica Mardi Gras Casino).

[2] Gold Strike was originally named as a defendant in this action, but it later settled plaintiffs' claims against it.

The Tunica County Tourism Commission (the "TCTC"), filed a lawsuit against Graziosi.  In its suit, the TCTC claimed that Graziosi was a "cybersquatter" — i.e., one who purchases a domain name with the hope of profiting from another person's trademark — and that she had no right to own "tunicamiss.com" or "tunicamississippi.com." The TCTC and Graziosi eventually settled the suit.  As part of the settlement, Graziosi transferred her rights in "tunicamiss.com" and "tunicamississippi.com" to the TCTC, and the TCTC relinquished all claims to the domain name "tunica.com."

In May 2001, TWA appeared before the TCTC and proposed to lease "tunica.com" collectively to all of the casinos in Tunica County, Mississippi. Under the terms of TWA's proposal, each casino in Tunica County would pay TWA $2,500 per month, and, in return, all visitors to "tunica.com" would be redirected to the TCTC's website, which already featured information about all of the casinos.  The casinos would also collectively have the right of first refusal to purchase "tunica.com."   Karen Sock, a TCTC member and the general manager of the Grand Casino Tunica, referred the matter to the Tunica Casino Operators Association (the "TCOA"), a trade association formed by the Tunica casinos.  On May 30, 2001, the TCOA held a meeting at which the members discussed "tunica.com" and TWA's proposal.  None of the casinos agreed to TWA's proposal, and the casinos apparently reached a consensus to not jointly utilize the "tunica.com" domain name.

Appellants contend that the May 30, 2001 meeting also gave rise to an agreement among the casinos to refuse to deal with TWA on any terms.  Shortly after the TCOA meeting, Clyde Callicott, the marketing director for Gold Strike, allegedly told Graziosi that the casinos had entered into a "gentlemen's agreement" to not do business with TWA, either individually or as a group.[3]  On

[3] Callicott attended the May 30, 2001 TCOA meeting.

June 6, 2001, Graziosi received an email from Callicott, stating that he had been instructed to terminate Gold Strike's existing relationship with TWA: "I was informed by my VP/GM (based on that discussion held at the TCOA meeting) to terminate the business relationship we have created with the 'tunica.com' site. I wish I could do more but my hands have been officially tied by the TCOA on this issue."

Appellants suggest that the motivation for the casinos' refusal to deal with TWA was to cause the value of "tunica.com" to decline. Graziosi asserts that Callicott told her that, at the May 30, 2001 meeting, Robert McQueen, General Manager of the Horseshoe Casino, stated that the domain name would be worthless if none of the casinos dealt with TWA. This understanding was also apparently confirmed by a conversation between Graziosi and Ellen Duffin, a marketing executive at the Grand Casino Tunica, sometime after the May 30, 2001 meeting.

After the May 30, 2001 meeting, TWA changed its business model. It created a website at "tunica.com" and hoped to generate revenue through casino advertising and/or commissions from online hotel bookings. With this new business model in place, TWA[4] approached a number of the casinos individually with proposals to advertise on "tunica.com," but none of the casinos chose to advertise on the site.[5] Appellants contend that the casinos' continued refusal to advertise on "tunica.com" was on account of their earlier agreement to boycott "tunica.com." Appellants also argue that the casinos reaffirmed their boycott of "tunica.com" at a November 2002 TCOA meeting. On November 19, 2002, Callicott, then the marketing director for the Sheraton Casino and Bally's,

---

[4] In mid-2002, Callicott and Memphis radio personality Rudi Schiffer also became involved with TWA's efforts to market "tunica.com" to the casinos.

[5] Gold Strike entered into a contract with TWA whereby TWA was permitted to book certain bus tours to Gold Strike on a commission basis. TWA never referred any bus tours to Gold Strike under the contract.

emailed Graziosi and told her that he understood that the TCOA had recently held a meeting at which the casinos voted to stay away from "tunica.com" "so it could evently [sic] be sold and bought at a later date by them."

Graziosi and TWA filed this action in 2003, asserting state and federal antitrust claims against the casinos, the TCTC, and the TCOA, as well as several state causes of action not relevant here.[6]  On November 24, 2004, the district court dismissed the antitrust claims against the TCTC, holding that the TCTC was immune from antitrust liability under the Local Government Antitrust Act, 15 U.S.C. § 35(a) (the "LGAA"), and the Parker state-action immunity doctrine.[7]  The court rejected the other defendants' claims that they were entitled to immunity from plaintiffs' antitrust claims under the LGAA, the Parker doctrine, and the Noerr-Pennington doctrine.[8]  The TCOA and Gold Strike were later dismissed from the suit by agreement of the parties.

On December 19, 2005, the district court granted summary judgment in favor of the remaining defendants (appellees here) on TWA's antitrust claims.[9] The district court found that: (1) the casinos' alleged conduct could not amount to a per se violation of section 1 of the Sherman Act; (2) any concerted refusal to deal with TWA arising from the May 30, 2001 TCOA meeting was not an unreasonable agreement in restraint of trade because it was a joint response to a joint proposal and because TWA did not produce sufficient evidence to show any anticompetitive effect; and (3) TWA did not show that the casinos' post-May

---

[6] The casinos also filed a number of counterclaims against Graziosi and TWA, but those counterclaims are not at issue on this appeal.

[7] See Parker v. Brown, 317 U.S. 341 (1943).

[8] See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); United Mine Workers v. Pennington, 381 U.S. 657 (1965).

[9] The district court held that Graziosi did not individually have standing to pursue the antitrust claims.  Although Graziosi is listed as an appellant, she does not appear to challenge the district court's standing ruling on appeal.

30, 2001 refusals to deal with TWA and "tunica.com" were the result of concerted action, in part because TWA did not provide the details of any of its post-May 30, 2001 proposals to the casinos.

II.

This court reviews the district court's grant of summary judgment de novo. Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., 200 F.3d 307, 312 (5th Cir. 2000). A party is entitled to summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all inferences in its favor. See Stewart Glass & Mirror, 200 F.3d at 312.

Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." In order to state a claim under section 1 of the Sherman Act, a plaintiff must show that the defendants "(1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." Spectators' Commc'n Network Inc. v. Colonial Country Club, 253 F.3d 215, 220 (5th Cir. 2001).[10] A necessary ingredient of any section 1 conspiracy is a showing of concerted action on the part of the defendants. See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984). To establish concerted action, the plaintiff must present "evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful

___

[10] The district court found, and the parties do not dispute, that TWA's federal and state antitrust claims are analytically identical. See Walker v. U-Haul Co. of Miss., 734 F.2d 1068, 1070 (5th Cir. 1984).

objective." Id. at 768. In other words, "[t]here must be evidence that tends to exclude the possibility of independent action." Id.; Bell Atl. Co. v. Twombly, 127 S. Ct. 1955, 1964 (2007) ("[A]t the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently."). Concerted action may be shown by either direct or circumstantial evidence. Monsanto Co., 465 U.S. at 764; Viazis v. Am. Ass'n of Orthodontists, 314 F.3d 758, 762 (5th Cir. 2002). Direct evidence of concerted action "is that which 'explicitly refer[s] to an understanding' between the alleged conspirators," while circumstantial evidence requires additional inferences in order to support a claim of conspiracy. Viazis, 314 F.3d at 762 (quoting Southway Theatres, Inc. v. Ga. Theatre Co., 672 F.2d 485, 493 n.8 (5th Cir. 1982)) (alteration in original).

Circumstantial evidence of a conspiracy in restraint of trade must be strong in order to survive summary judgment, because "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). Courts considering section 1 cases "will not draw inferences to support a claim that makes no economic sense; such a claim will require unusually persuasive evidence to withstand summary judgment." Spectators' Commc'n Network, 253 F.3d at 219-20; Matsushita, 475 U.S. at 587 ("[I]f the factual context renders respondents' claim implausible — if the claim is one that simply makes no economic sense — respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary."). In addition, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita, 475 U.S. at 588. In sum, a plaintiff can survive summary judgment only if it "show[s] that the inference of conspiracy is

reasonable in light of the competing inferences of independent action or collusive action that could not have harmed" the plaintiff. Id.

### III.

### A.

We first consider whether TWA has presented sufficient evidence of a conspiracy or concerted action on the part of the casinos to survive summary judgment. See AD/SAT v. Associated Press, 181 F.3d 216, 232 (2d Cir. 1999) ("Only after an agreement is established will a court consider whether the agreement constituted an unreasonable restraint of trade.").

The district court held that, viewing all of the summary judgment evidence in the light most favorable to TWA, the evidence was insufficient to establish concerted action by the casinos. The court found that the casinos' decision (at the May 30, 2001 TCOA meeting) to reject TWA's proposal that each casino pay TWA $2,500 per month to have visitors to "tunica.com" redirected to the TCOA's website could not be an unlawful agreement in restraint of trade because it was merely a joint response to a joint offer. The district court also held that TWA could not establish that the casinos' refusals to deal with TWA and "tunica.com" after May 30, 2001 were the result of concerted action, because the record did not contain any evidence of the details of the proposals that TWA made to the casinos after May 30, 2001.

We agree with the district court that the casinos' initial decision to reject TWA's $2,500 per-casino-per-month proposal was not an unreasonable agreement in restraint of trade. Given the joint nature of TWA's initial proposal, which invited the casinos to respond together as a single entity, the casinos' decision to reject that proposal is not concerted action subject to section 1. Cf. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984) (holding that joint actions of parent company and wholly-owned subsidiary are not subject to section 1 liability because the parent and subsidiary have "a complete

unity of interest"); VII Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u> ¶ 1477, at 315-16 (2d ed. 2003) (noting that actions of trade associations can, in some situations, be treated as actions of a single entity).

Our analysis does not end there, however. TWA submitted evidence that would tend to prove that the casinos did more than simply reject TWA's joint offer. TWA's evidence — such as Callicott's statements and emails to Graziosi indicating that the casinos had entered into a "gentlemen's agreement" to not deal with "tunica.com" and that Gold Strike had to terminate its relationship with "tunica.com" as a result of the casinos' agreement at the May 30, 2001 meeting — is, if credited, direct evidence that the casinos agreed not only to reject TWA's initial proposal, but also to refuse to do business with TWA and "tunica.com" individually. Although the district court purported to analyze TWA's claims on the assumption that all of the evidence proffered by TWA was true, it did not give meaningful consideration to Callicott's statements (allegedly later confirmed by Duffin) that the casinos had a "gentlemen's agreement" to not deal with TWA, and it failed to explain why that evidence, if credited, does not create a fact issue about whether the casinos engaged in concerted action. We believe that it does.

Moreover, if TWA's evidence of the casinos' actions after the May 30, 2001 TCOA meeting is credited, that evidence likewise creates an issue of fact as to whether the casinos engaged in concerted action. According to another email from Callicott to Graziosi, the casinos met in November 2002 and again decided to refuse to advertise on "tunica.com," in the hopes that the value of the domain name would decrease and the casinos could buy it at a later date. If TWA can establish concerted action by the casinos through this sort of direct evidence, then it is not required to provide circumstantial evidence, such as the details

surrounding its later proposals to the casinos, from which a concerted refusal to deal can be inferred.[11]

The casinos assert that much or all of TWA's direct evidence that they engaged in concerted action, including the statements and emails attributed to Callicott, is inadmissible hearsay. TWA counters that the challenged statements are admissible, non-hearsay evidence because they are admissions of a party opponent and/or statements of a co-conspirator. See Fed. R. Evid. 801(d)(2). Although the district court expressed some skepticism about the admissibility of much of TWA's evidence, it assumed for purposes of its summary judgment order that all of TWA's evidence was admissible, and it did not make any specific determinations about whether or not any particular piece of evidence was admissible.

Determining whether the statements that TWA attempts to attribute to the casinos via their employees are admissible as non-hearsay party admissions and/or co-conspirator statements will require a number of preliminary fact determinations, such as whether the speaker was authorized to speak on behalf of any of the casinos and, if so, whether the statement was made within the scope of the speaker's employment. The district court is better suited to rule on the admissibility of that evidence in the first instance, and, because the district court assumed that the evidence was admissible, we do the same for purposes

---

[11] Although, as the district court found, the casinos might well have had a number of valid, independent reasons why they might decline to do business with TWA and "tunica.com," those plausible reasons for independent action do not establish that appellees are entitled to summary judgment where the plaintiff has come forward with direct, rather than circumstantial, evidence of concerted action, since direct evidence of agreement necessarily tends to exclude the possibility of independent action. See Viazis, 314 F.3d at 762 ("[A]n antitrust plaintiff who is unable to present direct evidence of a conspiracy must introduce evidence that tends to exclude the possibility of independent action.") (emphasis added) (internal quotation marks omitted); Miles Distribs., Inc. v. Specialty Constr. Brands, Inc., 476 F.3d 442, 449 (7th Cir. 2007) ("When a plaintiff attempts to defeat summary judgment by highlighting circumstantial evidence of a conspiracy, some of the evidence must tend to exclude the possibility that the alleged conspirators acted independently rather than in concert.") (emphasis added).

of this ruling. Cf. Spectators' Commc'n Network, 253 F.3d at 224 n.3 ("Because the district court did not rule on the admissibility of the evidence, we will not do so in the first instance, but will consider it part of the record for the sake of argument.").

Accordingly, we hold that the district court erred when it found that TWA's proffered evidence did not create any issue of fact on the element of concerted action. On remand, the district court should consider the casinos' admissibility objections and determine whether the admissible evidence is sufficient to establish concerted action.

B.

We next consider TWA's argument that the casinos' refusal to do business with it amounts to a horizontal boycott that is per se unlawful under section 1.

To determine whether an agreement is an unlawful restraint on trade, we generally apply the "rule of reason," which requires us to consider whether the particular agreement at issue in fact operates as an unreasonable restraint on competition. See Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988); Spectators' Commc'n Network, 253 F.3d at 222-23. Under the rule of reason, an agreement will be found unlawful only if the plaintiff shows that it actually had an adverse effect on competition. See Consol. Metal Prods. v. Am. Petroleum Inst., 846 F.2d 284, 292-93 (5th Cir. 1988). Some types of agreements have, however, been found to be almost inherently anticompetitive. Such agreements can be considered per se violations of section 1, meaning that the law does not require a plaintiff to provide the usual proof that the agreement at issue is actually anticompetitive in the particular case. See NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 133 (1998) ("[C]ertain kinds of agreements will so often prove so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances."). On a general level, "[t]he

decision to apply the <u>per se</u> rule turns on whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output . . . or instead one designed to increase economic efficiency and render markets more, rather than less, competitive." <u>Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.</u>, 472 U.S. 284, 290 (1985) (internal quotation marks omitted) (ellipses in original).

It is clear that certain group boycotts or concerted refusals to deal can be <u>per se</u> violations of section 1. Precisely which group boycotts are subject to the <u>per se</u> rule is, however, not always clear. <u>Id.</u> at 294; <u>Spectators' Commc'n Network</u>, 253 F.3d at 223. In <u>NYNEX</u>, the Supreme Court clarified that a necessary precondition for a <u>per se</u> unlawful group boycott is that it must be "horizontal," <u>i.e.</u>, it must involve an agreement among firms that ordinarily compete with one another at the same level of the market. <u>See</u> <u>NYNEX</u>, 525 U.S. at 135 ("[P]recedent limits the <u>per se</u> rule in the boycott context to cases involving horizontal agreements among direct competitors."); <u>see also</u> <u>Bus. Elecs. Corp.</u>, 485 U.S. at 730 ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints.").

Under the definition of "horizontal" found in <u>NYNEX</u> and <u>Business Electronics Corp.</u>, the casinos' alleged agreement to not do business with TWA is clearly a horizontal agreement, as the casinos are direct competitors of one another. <u>See</u> <u>Bus. Elecs. Corp.</u>, 485 U.S. at 730 n.4 ("[A] restraint is horizontal not because it has horizontal effects, but because it is the product of a horizontal agreement.").

The casinos argue, and the district court essentially found (though using the wrong terminology), that a group boycott can be per se unlawful only if it is both horizontal and at least one of the conspirators is a direct competitor of the victim. In support of this argument, the casinos seize on certain language from decisions of this court and the Supreme Court that suggests that per se unlawful boycotts are those intended to harm or disadvantage a competitor of the conspirators. See Spectators' Commc'n Network, 253 F.3d at 223 (noting that earlier Supreme Court cases finding per se boycotts included a competitor of the victim among the conspirators);[12] Northwest Wholesale Stationers, 472 U.S. at 294 ("Cases to which the Court has applied the per se approach have generally involved joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.") (internal quotation marks omitted).[13] In addition, several older cases from this circuit can be read to require that the victim be a competitor of at least one member of the

---

[12] Earlier in the opinion, however, the Spectators' Communication Network court noted that "[t]o make a per se case, the horizontal agreement need not be between competitors of the victim." Id. at 223.

[13] See also Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co., 141 F.3d 947, 950 (9th Cir. 1998) (holding that horizontal boycott of supplier was not per se unlawful because the "conspiracy did not disadvantage a competitor" of the boycotting parties); Kenneth L. Glazer, Concerted Refusals to Deal Under Section 1 of the Sherman Act, 70 Antitrust L.J. 1, 31-41 (2002) (suggesting that per se rule should not apply to horizontal boycotts carried out exclusively by firms that are not direct competitors of the victim, because firms that are either upmarket or downmarket of the victim ordinarily have no economic incentive to reduce or inhibit competition at the victim's market level).

alleged conspiracy before the per se rule will apply.  See Blackburn v. Crum & Forster, 611 F.2d 102, 104 (5th Cir. 1980) (stating that application of the per se rule may be proper in cases "in which the plaintiff, the excluded party, is on the same competitive level with one member of the conspiracy.  In other words, in such cases it may be proper to infer anti-competitive motive and effect because the conspiracy has a horizontal aspect."); see also Plueckhan v. Farmers Ins. Exch., 749 F.2d 241, 246 n.8 (5th Cir. 1985) ("[In Blackburn], this court held that the horizontal component [necessary for per se liability] was missing since the alleged target did not compete with the alleged conspirators.").

Nothing in Northwest Wholesale Stationers or the Supreme Court's later cases, however, establishes a bright-line rule limiting the application of the per se rule to cases in which the victim is a competitor of at least one of the conspirators, and no such rule is justified under the Court's precedents.[14]  The Northwest Wholesale Stationers court set out a number of factors that it found relevant to the determination of whether the per se rule should apply to a particular group boycott.  First, as noted above, the Court observed that per se unlawful boycotts generally involved joint efforts "to disadvantage competitors by either directly denying or persuading or coercing suppliers to deny

---

[14] This court's decisions in Blackburn and Plueckhan are, of course, not good law to the extent that they limit application of the per se rule to horizontal boycotts in a manner not authorized by Northwest Wholesale Stationers and later cases. Moreover, Blackburn and Plueckhan both rely on a definition of a "horizontal" agreement that is inconsistent with the definition adopted by the Supreme Court in Business Electronics Corp. and NYNEX.

14

relationships the competitors need in the competitive struggle." Northwest Wholesale Stationers, 472 U.S. at 294 (internal quotation marks omitted). The Northwest Wholesale Stationers court went on, however, to discuss three other attributes that were often found in per se cases: that "the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete;" that "frequently the boycotting firms possessed a dominant position in the relevant market;" and that "the practices were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive." Id. The Court further stated that "a concerted refusal to deal need not necessarily possess all of these traits to merit per se treatment." Id. at 295.

Thus, although direct competition with the victim will frequently exist in cases of per se unlawful boycotts, nothing in Northwest Wholesale Stationers indicates that it is an absolute prerequisite to a finding of per se illegality if the agreement in question is marked by any of the other traits identified in that case.[15] In addition, the Supreme Court has itself found a horizontal boycott to be per se unlawful where the conspirators were all suppliers, not competitors, of the victim. In FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 422-23 (1990), the Court found a per se unlawful group boycott where a group

---

[15] See also William C. Holmes, Antitrust Law Handbook § 2:19, at 303 (2007 ed.) (noting category of per se cases involving concerted, horizontal action "directed 'vertically' at . . . suppliers or customers").

of indigent criminal defenders agreed to not accept further appointments unless they were paid at a higher rate.[16]

That the casinos' alleged agreement was a horizontal one does not necessarily mean that the agreement is per se unlawful. Northwest Wholesale Stationers, 472 U.S. at 295; see also Paladin Assoc., Inc. v. Montana Power Co., 328 F.3d 1145, 1155 (9th Cir. 2003); Diaz v. Farley, 215 F.3d 1175, 1182 (10th Cir. 2000). "Sometimes group boycotts are called per se violations, but the label here is only minimally useful since many arrangements that are literally concerted refusals to deal have potential efficiencies and are judged under the rule of reason." The Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island, 373 F.3d 57, 61 (1st Cir. 2004). Moreover, to the extent that TWA alleges that the casinos endeavored to put it out of business, "the Supreme Court rejected the argument that the defendants' motive of putting the plaintiff out of business [brings] the case within the per se rule." Spectators' Commc'n Network, 231 F.3d at 1013 (citing NYNEX, 525 U.S. at 137-38).

The Supreme Court has recently reiterated that "[t]o justify a per se prohibition a restraint must have manifestly anticompetitive effects and lack any redeeming virtue." Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 127 S. Ct. 2705, 2007 WL 1835892, at *7 (Jun. 28, 2007) (internal citations omitted).

---

[16] Superior Court is, admittedly, somewhat distinguishable from this case, as it involved a boycott that was specifically designed to effectuate a price-fixing agreement among the conspirators, but it nevertheless undercuts appellees' claim that direct competition with the victim is an indispensable element of a per se unlawful boycott.

In Leegin, the Supreme Court emphasized its general reluctance to apply the per se rule unless "the courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." Id.

Applying the foregoing principles, we conclude that the district court erred in finding that the per se rule only applies in situations where one of the conspirators is a direct competitor of the victim. Instead, to determine the applicability of the per se rule in this case, the district court should have analyzed the following factors: (1) whether the casinos hold a dominant position in the relevant market; (2) whether the casinos control access to an element necessary to enable TWA to compete; and (3) whether there exist plausible arguments concerning pro-competitive effects. See Northwest Wholesale Stationers 472 U.S. at 294, 296. Accordingly, we reverse the district court and remand this case so it can consider these factors in the first instance.

## CONCLUSION

For the reasons stated above, we reverse the district court's grant of summary judgment in favor of the casinos, and remand this case to the district court for further proceedings consistent with this opinion.[17]

---

[17] We agree with the district court that TWA and the casinos are not in competition with each other. TWA operates a website. The casinos own and operate casinos, hotels, and other leisure-related activities. They simply do not compete for the same customer base. Although the casinos own and operate their own websites, they have never leased websites nor sold internet advertising. As the district court correctly concluded, "the casinos were simply prospective customers of [TWA], nothing more."

Moreover, because we remand to the district court for consideration of the admissibility of TWA's proffered evidence, we do not reach the casinos' additional argument that there is

REVERSED AND REMANDED.

---

insufficient evidence that Hollywood Casino participated in any conspiracy. We also do not consider the casinos' additional argument that TWA cannot establish an antitrust injury. The district court did not reach that argument, and the defendants are free to reurge it on remand. Finally, we reject the casinos' immunity claims for essentially the reasons stated in the district court's November 24, 2004 order.