# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 23, 2008

Charles R. Fulbruge III
Clerk

No. 07-40954

GOLDEN BRIDGE TECHNOLOGY INC

Plaintiff - Appellant

v.

MOTOROLA INC; ERICSSON INC; PANASONIC MOBILE
COMMUNICATIONS DEVELOPMENT CORP OF USA; QUALCOMM
INCORPORATED; LUCENT TECHNOLOGIES INC

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Texas

Before GARZA and ELROD, Circuit Judges, and HICKS,[*] District Judge.

EMILIO M. GARZA, Circuit Judge:

Plaintiff Golden Bridge Technology, Inc. ("GBT") appeals the district court's grant of summary judgment in favor of the defendants.[1] The district court granted summary judgment against GBT's claim that the defendants

---

[*] District Judge of the Western District of Louisiana, sitting by designation.

[1] The summary judgment briefing included defendants Nokia, Motorola, T-Mobile, Ericsson, Qualcomm, and Lucent. Subsequently the district court entered dismissals as to T-Mobile and Nokia, so the only appellees to this action are Motorola, Ericsson, Qualcomm, and Lucent ("Appellees").

unlawfully conspired not to deal with GBT in violation of the Sherman Antitrust Act.  For the following reasons, we affirm.

I

Golden Bridge Technology ("GBT") develops wireless communications technology for cellular networks.  Along with the Appellees, GBT is a member of a non-profit standard setting organization called Third Generation Partnership Project ("3GPP").  3GPP institutes uniform technology standards for the telecommunications industry to ensure worldwide compatibility of cellular devices and systems.  More than 260 companies belong to 3GPP, representing all levels of the cell phone industry.  The 3GPP members are responsible for creating and developing the 3GPP standard, which means determining what technologies will be included in the standard as either mandatory or optional features.

GBT owns patents to Common Packet Channel technology ("CPCH"), which allows the transmittal of electronic information packets between cellular phones and base stations.  In 1999, 3GPP adopted CPCH as an optional feature.  Optional status meant that manufacturers did not have to use CPCH, but if they chose to they had to follow the 3GPP standard to ensure compatibility with other equipment and networks.  Since that time, two companies have obtained licenses to use CPCH, but neither company has field tested or implemented the technology.

Changes to the 3GPP standard occur through consensus of the individual members.  Individual members are divided into Working Groups, which have different responsibilities related to developing the standard.  Each Working Group belongs to one of six Technical Specification Groups, and the Technical Specification Groups are presided over at the top level by the Project Coordination Group.  The Working Groups propose changes to the 3GPP standard by submitting change requests to the other Working Groups, which if

approved are submitted to the relevant Technical Specification Group for decision. The opposition of a single individual member prevents approval of a change request, unless 71% of individual members attending a subsequent plenary meeting vote to adopt the change. Technical decisions are appealable to the Project Coordination Group.

At the 2004 plenary meeting for the Technical Specification Group to which GBT and the Appellees belonged, individual members wanted to simplify the 3GPP standard by removing old and unused technologies. At a subsequent Working Group meeting in Scottsdale, Arizona, two individual members presented a proposed feature clean-up list that did not include CPCH. No decision was reached, and the clean-up discussions continued via emails between several companies in attendance at the Scottsdale meeting. These companies (including Motorola, Ericsson, and Qualcomm, but not Lucent) discussed adding CPCH to the clean-up list. No agreement was reached and they ultimately declined to include it, apparently due to concerns that its inclusion would prevent consensus. GBT did not attend this meeting and was not included on the emails.

The next plenary meeting occurred in Tokyo, Japan. Appellees all attended this meeting, but GBT did not. The proposed feature clean-up list was presented, still not including CPCH. However, an Ericsson representative spoke out in front of the entire group, suggesting adding CPCH to the clean-up list. Cingular, a previous friend of CPCH, announced support for removal. No objections arose. Discussion turned to other issues, and the chairperson of the plenary meeting requested that the members hold an offline session to obtain consensus on unresolved items. On the final day of the plenary meeting, the members presented the revised clean-up list with CPCH included. No one objected, so the Working Groups created change requests for each feature on the list. These change requests were approved at a subsequent Working Group

meeting, which GBT failed to attend. At the following plenary meeting in Quebec, the change requests obtained final unanimous approval and all of the features on the revised clean-up list were removed from the 3GPP standard. GBT also failed to attend this meeting and did not appeal CPCH's removal to the Project Coordination Group.

GBT filed this lawsuit prior to the Quebec meeting, alleging a violation of the Sherman Antitrust Act, 15 U.S.C. § 1. GBT claimed that the defendants conspired with each other to remove CPCH from the 3GPP standard, resulting in the unlawful exclusion of GBT from the market. The district court granted the defendants' motion for summary judgment, finding that GBT had failed to present any evidence of a conspiracy. GBT now appeals.

II

We review the district court's grant of summary judgment de novo, applying the same standard as the district court. Fabela v. Socorro Indep. Sch. Dist., 329 F.3d 409, 414 (5th Cir. 2003). We view all facts in the light most favorable to the non-movant, and affirm only when the evidence "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED R. CIV. P. 56(c); see also Coury v. Moss, 529 F.3d 579, 584 (5th Cir. 2008).

The Supreme Court has specified what a plaintiff must show to avoid summary judgment on a Sherman Act § 1 claim:

> To survive a motion for summary judgment . . . a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently. Respondents . . . must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents.

See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). Accordingly, we reverse the district court's grant of summary

4

judgment only where the evidence is strong enough to reasonably exclude the possibilities of independent action and conduct consistent with permissible competition. See Tunica Web Adver. v. Tunica Casino Operators Ass'n, 496 F.3d 403, 409 (5th Cir. 2007).

III

Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Although § 1 could be read to outlaw all contracts, it has long been interpreted to only proscribe unreasonable restraints. See Leegin Creative Leather Prods. v. PSKS, Inc., 127 S. Ct. 2705, 2712 (2007). To establish a § 1 violation, a plaintiff must prove that: (1) the defendants engaged in a conspiracy; (2) that restrained trade; (3) in the relevant market. See Apani Sw., Inc. v. Coca-Cola Enter., Inc., 300 F.3d 620, 627 (5th Cir. 2002). Once a plaintiff establishes that a conspiracy occurred, whether it violates § 1 is determined by the application of either the per se rule or the rule of reason. See Spectators' Commc'n Network, Inc. v. Colonial Country Club, 253 F.3d 215, 222-23 (5th Cir. 2001). If the court determines that the defendant's conduct "would always or almost always tend to restrict competition and decrease output," the restraint is per se illegal and no further inquiry occurs. See Leegin, 127 S. Ct. at 2713. However, if the conduct is not deemed per se unreasonable, the plaintiff will also have to prove that the conduct unreasonably restrains trade in light of actual market forces under the rule of reason. Id.

Regarding the conspiracy element, the Supreme Court recently observed that "the crucial question [in a § 1 claim] is whether the challenged anticompetitive conduct stems from independent decision or from an agreement." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (internal quotations omitted). The plaintiff must present evidence that the defendants engaged in

concerted action, defined as having "a conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984). Concerted action may be shown by either direct or circumstantial evidence. Direct evidence explicitly refers to an understanding between the alleged conspirators, while circumstantial evidence requires additional inferences in order to support a conspiracy claim. See Tunica, 496 F.3d at 409. Independent parallel conduct, or even conduct among competitors that is consciously parallel, does not alone establish the contract, combination, or conspiracy required by § 1. See Bell Atlantic, 127 S. Ct. at 1964.

GBT argues that email communications between the Appellees and others following the Scottsdale meeting show a conspiracy, in the form of a group boycott, to eliminate CPCH from the 3GPP standard. The district court disagreed, granting summary judgment because GBT failed to present any evidence supporting the inference of a conspiracy. We agree.

As a threshold matter, GBT has presented only circumstantial evidence of a conspiracy. None of the emails, or any other evidence GBT presents, show an explicit understanding between the Appellees to collude and unlawfully eliminate CPCH from the standard. Compare Tunica, 496 F.3d at 410 (finding that email communications show conspiracy because they contain direct evidence stating that the parties entered into a "gentlemen's agreement" not to deal with another company). Unlike Tunica, here the emails actually reveal disagreement among the Appellees. The Appellees disliked CPCH for different reasons and wanted to remove it at different times. They disagreed about the very action GBT claims constituted the conspiracy—whether to add CPCH to the clean-up list being presented at the Tokyo meeting. Viewing the evidence favorably to GBT, the emails do reveal a common dislike for CPCH among some of the Appellees and other companies. However, common dislike is not the same as an

6

explicit understanding to conspire, so we accordingly review GBT's claim under the stricter standard required for circumstantial evidence.

To show conspiracy, circumstantial evidence must tend to exclude the possibility that the Appellees acted independently. See Matsushita, 475 U.S. at 587-88. However, GBT has presented no evidence refuting the possibility that the Appellees found CPCH outdated and independently supported its removal. Viewed most favorably to GBT, the evidence indicates that some of the Appellees communicated their dislike of CPCH to each other, and that each Appellee hoped CPCH would eventually be removed from the standard. However, at least one Appellee (Lucent) only expressed a desire to remove CPCH in internal company emails, and was not part of the group email discussions. This evidence amounts to an exchange of information, followed by parallel conduct when the Appellees (and over 100 other companies) unanimously voted to remove CPCH, and it does not refute the likelihood of independent action. See Consol. Metal Prods., Inc. v. Am. Petroleum Inst., 846 F.2d 284, 294 n.30 (5th Cir. 1988) (noting that the mere exchange of information, or even consciously parallel action, is insufficient to establish a conspiracy under § 1). Moreover, the action that GBT alleges implemented the conspiracy—when the Ericsson representative moved to place CPCH on the clean-up list at the Tokyo meeting—occurred independently before the entire plenary body, and GBT offers no evidence indicating it resulted from any explicit agreement. On the contrary, the evidence indicates that Ericsson's action was in opposition to what some of the other Appellees wanted, due to their concerns about Cingular's allegiance to CPCH.

GBT argues that the Appellees' had economic motives to remove CPCH, demonstrating that they did not act independently. These purported motives include avoiding the payment of royalty fees to use CPCH and promoting their own competing technology. The first motive finds no support in the evidence,

because none of the Appellees, and in fact no company at all, had ever paid royalties to GBT for CPCH. Further, CPCH was an optional feature in the 3GPP standard. There was no rational reason for the Appellees to conspire to unlawfully remove CPCH to avoid paying royalties, when they could simply opt not to use it. Regarding the alleged competing-technology motive, such evidence does not exclude the possibility of independent conduct. Appellees could still support CPCH's removal because they disliked it, even if they owned competing technology. In fact, the existence of an independent financial motive to remove CPCH might be an independent reason for each Appellee company to support CPCH's removal. It is not sufficient under Matsushita for GBT to simply propose conceivable motives for conspiratorial conduct; GBT's evidence must tend to show that the possibility of independent conduct is excluded. See Matsushita, 475 U.S. at 587-88. GBT's evidence does not tend to exclude the possibility that the Appellees acted independently, motivated by a desire to improve the 3GPP standard by removing outdated and underused technologies.

Moreover, the Appellees presented evidence showing that these informal communications are an important part of the standard setting process, and that the 3GPP standards are beneficial to the market. We have maintained that "it has long been recognized that the establishment and monitoring of trade standards is a legitimate and beneficial function." Consol. Metal Prods., 846 F.2d at 293-94 (finding that though a trade association naturally involves collective action by competitors, it is not by its nature a "walking conspiracy"). The standards 3GPP sets allow the numerous necessary components of cellular communications to operate compatibly. Potential procompetitive benefits of standards promoting technological compatibility include facilitating economies of scale in the market for complementary goods, reducing consumer search costs, and increasing economic efficiency. See ABA SECTION OF ANTITRUST LAW, HANDBOOK ON THE ANTITRUST ASPECTS OF STANDARD SETTING 10 (2004). We

have found it "axiomatic" that a standard setting organization must exclude some products, and such exclusions are not themselves antitrust violations. See Consol. Metal Prods., 846 F.2d at 294. To hold otherwise would stifle the beneficial functions of such organizations, as "fear of treble damages and judicial second-guessing would discourage the establishment of useful industry standards." Id. at 297. Accordingly, we decline to infer conspiratorial action on the basis of limited circumstantial evidence, particularly where this evidence is at least as consistent with permissible competition, and with independent action, as with unlawful conspiracy. See Matsushita, 475 U.S. at 588.

As GBT has not met the threshold requirement of demonstrating the existence of an agreement in restraint of trade, we need not review the district court's findings as to the remaining requirements of a § 1 violation.[2]

## IV

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.

---

[2] Accordingly, though we affirm the district court's ruling, our opinion should not be construed to endorse its conclusion that if GBT had shown an agreement in restraint of trade, the Appellees' conduct would be considered per se illegal. A proper review of that conclusion would consider whether it conflicts with Consol. Metal Prods., where we held that a standard setting organization's decision not to certify a particular product did not pe se violate Sherman Act § 1. See 846 F.2d at 292.